```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
                                          :
MARITIMA DE ECOLOGIA, S.A. DE C.V.,        :
                                          :   10 Civ. 8134 (DLC)
                         Plaintiff,       :   OPINION AND ORDER
                                          :
              -v-                         :
                                          :
SEALION SHIPPING LTD.,                    :
                                          :
                         Defendant.       :
                                          :
----------------------------------------- X
```

APPEARANCES:

For Plaintiff:
Keith B. Dalen
Brian P. R. Eisenhower
Hill Rivkins LLP
45 Broadway, Suite 1500
New York, NY 10006

For Defendant:
Simon Harter
Law Offices of Simon Harter, Esq.
304 Park Ave. South – 11th Floor
New York, NY 100010

DENISE COTE, District Judge:

Maritima de Ecologia, S.A. de C.V. ("Marecsa") brings this action against Sealion Shipping Ltd. ("Sealion") for breach of contract, unjust enrichment, and quantum meruit. Sealion has moved to compel arbitration and to stay the litigation. For the following reasons, the motion to compel arbitration is denied but the litigation is stayed pending the completion of the

ongoing arbitration of Sealion's claims against Marecsa in London.

## BACKGROUND

Marecsa, a corporation organized under the laws of Mexico, provides support services to oil companies and rigs operating in the Gulf of Mexico. Sealion, an English corporation, acts as a manager for vessels owned by Toisa Limited ("Toisa") and another related entity, and occasionally bareboat charter vessels from Toisa.

The dispute at issue arises from services that Marecsa provided in 2010 in connection with the Deepwater Horizon catastrophe in the Gulf of Mexico (the "Gulf") without the benefit of a written agreement. Sealion's demand for arbitration depends upon two prior sets of written agreements that the parties executed to permit Marecsa to support Mexican oil exploration in the Gulf. Certain of the contracts in those two commercial transactions contained London arbitration clauses.

A. The First Pemex Exploration and Production Contract

Marecsa and Sealion's relationship began when the corporations executed a series of agreements to prepare a tender to provide an offshore oil exploration support vessel to Pemex Exploration and Production ("PEP"), a state-owned Mexican oil

exploration company.  On November 27, 2002, Marecsa, Sealion, and a third company entered into a "Collaboration Agreement," pursuant to which the parties agreed to "work jointly [to] supply a Well Testing Services Vessel to the operations" of PEP. The Collaboration Agreement did not include a choice of law provision or an arbitration clause.

The same day that the parties concluded the Collaboration Agreement, Sealion and Marecsa executed a "Side Letter."  The Side letter provided, in relevant part, that the

> attached Collaboration Agreement . . . has been executed by both parties solely and exclusively for the purpose of permitting Marecsa to present to Pemex a fully complying tender proposal.  As such, it is to have no binding contractual or legal effect between the parties and is null and void in all respects.
>
> It is further provided that the parties will negotiate and sign a separate and complete Joint Venture Agreement, in respect to the actual work to be undertaken by the parties upon terms and conditions to be negotiated and mutually agreed and that this Joint Venture Agreement shall constitute and govern the relationship between the parties.

A choice of law and forum selection clause in the Side Letter provided that the agreement would be "governed by English law and any dispute arising [under it] shall be referred to arbitration in London" under the London Maritime Arbitrators Association ("LMAA") rules.  Subsequent to the conclusion of the Collaboration Agreement and the Side Letter, on or about June 8, 2003, Marecsa was awarded a five-year contract to supply a well

testing services vessel, the Toisa Pisces, to service PEP's oil rigs in the Gulf (the "First PEP Contract").

As contemplated by the Side Letter, on January 28, Marecsa and Sealion entered two agreements concerning the execution of the First PEP Contract.  The Joint Venture Agreement along with the "related" Subcontractor Agreement determined "the relationship of Marecsa and Sealion."  The Joint Venture Agreement created a structure for dividing earnings between the two corporations.  Pursuant to the Subcontractor Agreement, Sealion in its "position as Disponent Owner of the [Toisa Pisces]" appointed Marecsa to be the "Subcontractor" of the vessel's "deck processing plant."[1]  Both the Joint Venture and the Subcontractor Agreements included a choice of law and arbitration provision stating that the "Agreement is to be construed and interpreted in accordance with English Law and any dispute arising from [the] Agreement, or its interpretation, shall be referred to arbitration in London in accordance with LMAA rules."  The First Pemex Contract terminated by its terms on or about March 4, 2008.

Disputes arose between the parties and on June 3, 2008, Sealion and Marecsa entered a "Transaction Agreement" concerning

---

[1] On June 3, 2008, the parties entered "Addendum No. 1" to the Subcontractor Agreement.  This agreement did not alter the arbitration and choice of law clause in the original agreement.

4

"unpaid charter hire and other expenses due and owing to Sealion" at the conclusion of the First PEP Contract. Like the preceding contracts, the Transaction Agreement provided that it was to be "construed and interpreted in accordance with English Law" and any dispute arising under it "shall be referred to arbitration in London." The Transaction Agreement also specified, however, that if Marecsa failed to comply with certain obligations, "Sealion has the right to pursue Marecsa both criminally and/or civilly . . . in whatever court and/or jurisdiction it deems necessary or appropriate in its sole discretion."

B. The Second PEP Contract

On or about March 8, 2008 -- before the parties had concluded the Transaction Agreement resolving disputes related to the First PEP Contract -- PEP awarded Marecsa a second contract (the "Second PEP Contract"). Marecsa, Sealion, and a third party entered a "Tripartite Agreement" on March 14, which defined each party's role and responsibilities in fulfilling the Second PEP Contract. On the same day, Marecsa and Sealion entered a separate agreement (the "Disputed Terms Agreement"), pursuant to which Marecsa agreed to request that PEP amend certain "Disputed Terms" in the Second PEP Contract "through Modification Agreements on terms satisfactory to Sealion." Both

the Tripartite and the Disputed Terms Agreements included the same choice of law and arbitration provision used in the Joint Venture and Subcontractor Agreements.[2]  The Second PEP Contract expired on March 21, 2010.

C. Deepwater Horizon Transaction

After the Second PEP Charter expired, the vessel Toisa Pisces and its personnel remained on standby while Sealion and Marecsa negotiated a third contract with PEP.  At the end of April 2010, however, BP p.l.c. ("BP") hired the Toisa Pisces to assist in the cleanup of the oil spill caused by the Deepwater Horizon oil drilling rig.  Sealion's New York agent -- Brokerage & Management Corp. -- approached Marecsa to arrange for Marecsa to provide the personnel necessary for Sealion to perform the BP contract.  On or about May 21, 2010, the Toisa Pisces entered United States waters with Marecsa personnel on board, but the parties never concluded a written agreement concerning the transaction.  Marecsa personnel remained on the vessel, providing services until at least September 24, 2010.  Although Marecsa billed Sealion for its fees and expenses relating to the Deepwater Horizon work, these invoices have not been paid.

---

[2] The parties entered a contemporaneous addendum to the Tripartite Agreement, which left intact the arbitration and choice of law provision.

On October 27, 2010, Marecsa filed this action against Sealion seeking $1,152,946.57 in fees for the services Marecsa provided in connection with the Deepwater Horizon cleanup effort.  On December 7, 2010, Sealion served Marecsa with an arbitration demand for alleged breaches of two agreements relating to the First PEP Contract -- the Joint Venture Agreement and the Transaction Agreement (the "London Arbitration").  On January 13, 2011, Sealion filed a motion to compel arbitration and stay litigation.  Sealion's motion became fully submitted on February 11.

## DISCUSSION

Sealion moves to compel arbitration of Marecsa's claims and to stay litigation.  Sealion concedes that there is no written agreement to arbitrate the plaintiff's claims arising from the Deepwater Horizon transaction, but it contends that a binding agreement to arbitrate can be implied from the parties' prior course of dealing.  Should the Court deny its motion to compel arbitration, Sealion requests that the case be stayed pending the conclusion of London Arbitration concerning the agreements related to the First PEP Contract.

I. Motion to Compel Arbitration

It is undisputed that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "Convention"), 21 U.S.T. 2517, 330 U.N.T.S. 38, reprinted at 9 U.S.C. § 201, governs this international commercial transaction and that the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1, et seq., and the Convention "have overlapping coverage to the extent that they do not conflict." Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 102 n.1 (2d Cir. 2006) (citation omitted). Under the Convention, an agreement to arbitrate exists if:

> (1) There is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope.

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.3d 135, 146 (2d Cir. 2001) (emphasis supplied).

It is only the first of these four prongs -- whether there is a "written agreement" -- that is in dispute here. The Convention defines "agreement in writing" to "include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." Convention, art. II, ¶ 2. See also Kahn Lucas Lancaster, Inc. v. Lark Intern, Ltd., 186 F.3d 210, 215 (2d Cir.

1999) (holding that under the Convention, a written agreement, "whether it be an arbitration agreement or an arbitral clause in a contract, [must] be signed by the parties or contained in a series of letters or telegrams").

Sealion acknowledges that there is no writing in which the parties agreed to arbitrate claims arising from the Deepwater Horizon cleanup.  Furthermore, Sealion has not identified any legal authority to suggest that anything other than a written agreement provides an adequate basis upon which to compel arbitration under the Convention.[3]  Thus, Sealion's motion to compel arbitration is denied.

Sealion principally argues that the term "written agreement" in the Convention and the FAA should not be given an "overly literal" interpretation and that, under English law, an agreement to arbitrate can be implied from the parties' prior course of conduct.  This argument lacks merit for at least three

---

[3] To escape the plain meaning of the "written agreement" requirement in both the FAA and the Convention, Sealion points to case law holding that certain non-signatories to an arbitration agreement may nevertheless be compelled to arbitrate disputes covered by the agreement.  These cases are distinguishable since, in all of them, there was a written agreement in which at least two parties agreed to arbitrate a particular type of dispute.  Therefore, in these cases, the issue was whether a non-signatory had a sufficient identity of interest with one of the parties that had originally agreed in writing to arbitration.  Here, however, Sealion cannot identify any written agreement covering disputes arising from the Deepwater Horizon transaction.

reasons. First, Sealion assumes English law should control, without conducting a proper choice of law analysis. As explained below, a choice of law analysis would result in the designation of United States law. Second, under United States law, there is no basis for implying an agreement to arbitrate solely from a past course of conduct. And, finally, even if English law applied to the dispute, the expert affidavit upon which Sealion relies establishes no more than speculation that an implied agreement to arbitrate <u>might</u> be recognized in the United Kingdom.

"Federal maritime law, including federal maritime choice-of-law rules, applies to maritime contracts." <u>Sundance Cruises Corp. v. Am. Bureau of Shipping</u>, 7 F.3d 1077, 1080 (2d Cir. 1993). "A maritime contract is one that relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment." <u>Id</u>. (citation omitted). New York choice-of-law rules require application of federal maritime law to maritime cases, therefore "federal maritime law governs this case, whether by direct application of admiralty rules . . . or by way of New York law." <u>Id</u>. at 1081. In <u>Advani Enterprises v. Underwriters at Lloyds</u>, 140 F.3d 157 (2d Cir. 1998), the Second Circuit identified five

"contacts" which guide a court's choice-of-law analysis "[u]nder federal choice-of-law rules":

> (1) Any choice-of-law provision contained in the contract; (2) the place where the contract was negotiated, issued, and signed; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties.

Id. at 162.

Following the choice-of-law standard articulated in Advani, United States law applies to this dispute. Marecsa negotiated with Sealion's New York agent regarding the Deepwater Horizon transaction, the contract was to be performed on the United States side of the Gulf, and the subject matter of the contract -- Marecsa's services -- were to be provided in United States waters. The only "contact" suggesting that it may be appropriate to apply English law is that Sealion is incorporated in the United Kingdom. This single consideration does not outweigh the other factors favoring application of United States law. Indeed, in its reply papers, Sealion does not respond to Marecsa's argument that United States law governs.

Sealion has not demonstrated that under United States law a binding agreement to arbitrate can arise exclusively from a prior course of dealing. Many of the cases to which it cites

11

are readily distinguishable.[4] In Leadertex, Inc. v. Morganton Dyeing & Finishing Corp., 67 F.3d 20 (2d Cir. 1995), the Second Circuit found that the parties had an agreement to arbitrate since the plaintiff had "received some 100 forms incorporating the arbitration clause" during its transactions with the defendant. Id. at 25. Leadertex does not suggest that in the absence of an agreement, a prior course of dealing could be used to imply that one existed. Even Schubetx, Inc. v. Allen Snyder, Inc., 49 N.Y.2d 1 (1979), on which Leadertex relied, is of little support to the defendant. In Schubetx there was a written agreement to arbitrate but insufficient evidence that the parties "expressly agreed" to incorporate it into the business dealings at issue in that case. Schubetx, 49 N.Y.2d at 6. Similarly, in Chelsea Square Textiles, Inc. v. Bombay Dyeing and Mfg. Co., Ltd., 189 F.3d 289 (2d Cir. 1999), since the parties had previously entered a series of contracts including an arbitration clause, the plaintiff could not avoid arbitration

---

[4] Many of the cases upon which Sealion relies are inapposite since they do not concern arbitration agreements. See, e.g., St. Paul Fire & Marine Ins. Co. v. Courtney, 270 F.3d 621, 624 n.2 (8th Cir. 2001)(personal jurisdiction); Insurance Co. of N. Am. V. NNR Aircargo Serv. (USA), Inc., 201 F.3d 1111, 1115 (9th Cir. 2000) (limiting liability); Capitol Converting Equipment, Inc. v. LEP Transport, Inc., 965 F.2d 391, 395 (7th Cir. 1992) (limiting liability); Trinidad Corp. v. S.S. Sister Katingo, 280 F. Supp. 976, 977 (S.D.N.Y. 1967) (liability disclaimer).

merely because the text of the clause in one of the many contracts was illegible.  Id. at 296.[5]

Finally, even under English law it is unlikely that Marecsa would be compelled to arbitrate its claims arising from the Deepwater Horizon transaction.  Sealion's expert opines that, under "English law . . . [a]n implied arbitration agreement will most usually be held to exist where the parties proceed with an arbitration each taking positive steps to progress that arbitration without objection."  Marecsa, however, has not taken any "positive steps" toward arbitrating its dispute with Sealion concerning the Deepwater Horizon transaction.[6]

II. Motion to Stay Pending the London Arbitration

Even if Marecsa's claims are not subject to compulsory arbitration, Sealion argues that this case should be stayed pending the resolution of disputes relating to the First PEP Contract, which are currently being arbitrated in London.

---

[5] It bears mention that none of these three decisions construed the Convention or applied it.

[6] After this motion became fully submitted, the parties exchanged letters regarding the legal significance of Marecsa's letter to the London arbitrator, which stated that "if [Sealion] continue[s] to insist that [the arbitrator] has jurisdiction . . . [it] is for the Tribunal to rule on its own jurisdiction" of the "Toisa Pisces/Deepwater Horizon dispute."  This statement does not constitute a "positive step" toward arbitrating the Deepwater Horizon claims.  Indeed, in the same paragraph Marecsa goes on to "reject that the Tribunal has any jurisdiction over the Deepwater Horizon dispute."

"[D]istrict courts . . . may stay a case pursuant to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." WorldCrisa v. Armstrong, 129 F.3d 71, 76 (2d Cir. 1997) (citation omitted). For instance, "[a] trial court may, with propriety, . . . enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." Admin. Comm. Of the Time Warner, Inc. Benefit Plans v. Biscardi, 99 Civ. 12270 (DLC), 2000 WL 565210, at *1 (S.D.N.Y. May 8, 2000) (citation omitted). These independent proceedings need not be "controlling of the action before the court." Id. (citation omitted); accord Sierra Rutile, Ltd. v. Katz, 937 F.2d 743, 750 (2d Cir. 1991) (pending arbitration). "The Court must consider factors such as the desirability of avoiding piecemeal litigation and the degree to which the cases necessitate duplication of discovery or issue resolution." Biscardi, 2000 WL 565210, at *2 (citation omitted). But "no hard-and-fast rules provide resolution of this discretionary decision." Id. (citation omitted).

Since the outcome of the ongoing London Arbitration will have a significant bearing on this case, Sealion's motion for a stay is granted. In its complaint, Marecsa recognizes that the fees it earned for providing services under the PEP contracts

are relevant to determining a reasonable rate for the Deepwater Horizon transaction.  Specifically, Marecsa alleges that "[b]y virtue of the parties' course of dealing, SEALION was aware of the approximate fees for MARECSA's services inclusive of profit margins."  The final rate of pay to which Marecsa refers, however, is contingent upon the outcome of the pending London Arbitration.  Furthermore, while Marecsa has not demonstrated that it would suffer any material harm if its claims were stayed pending the London proceeding, both parties will be prejudiced if they are required to engage in duplicative litigation.

Marecsa argues that since the PEP contracts were entered in commercial transactions that were entirely separate from the Deepwater Horizon transaction, this case should not be stayed pending the London Arbitration.  This argument is unavailing.[7]  Although the parties' prior course of dealing is an inadequate basis from which to imply an agreement to arbitrate, it is critical to determining a fair rate of pay for the services Marecsa provided Sealion in fulfilling the Deepwater Horizon contract.

---

[7] Since the stay is granted pursuant to the Court's "inherent" power as opposed to § 3 of the FAA, it is not necessary to address Marecsa's arguments regarding why the FAA does not compel a stay.

## CONCLUSION

The defendant's January 13, 2011 motion to compel arbitration is denied, but its motion to stay is granted. The parties shall submit a status letter by September 15, 2011.

SO ORDERED:

Dated:  New York, New York
        April 15, 2011

                                        DENISE COTE
                            United States District Judge