# DECLARATION OF ROBERT POLLOCK-HILL

## EXHIBIT B

**<u>IN THE MATTER OF THE ARBITRATION ACT 1996</u>**

**<u>AND</u>**

**<u>IN THE MATTER OF AN ARBITRATION</u>**

**<u>BETWEEN:</u>**

SEALION SHIPPING LTD
of England                                                                <u>Claimants</u>

and

MARITIMA DE ECOLOGIA S.A. de C.V.
of Mexico                                                                <u>Respondents</u>

**<u>"TOISA PISCES" - Agreement dd 3.6.08</u>**

**<u>FINAL AWARD</u>**

**WHEREAS:**

(A)   By a "Transaction Agreement" dated 3 June, 2008, the parties agreed to compromise certain disputes that had arisen between them relating to a Joint Venture Agreement concerning the claimants' (hereafter "Sealion") vessel *Toisa Pisces.*

(B)   Clause 14 of the said Transaction Agreement provided for it to be subject to English law and for any disputes arising thereunder to be referred to arbitration in London in accordance with "LMAA rules".

(C)   Disputes having arisen, the parties agreed to appoint me, the undersigned Bruce Harris of Flat 101, 7 High Holborn, London

WC1V 6DR as sole arbitrator.  I accepted appointment on the basis of the LMAA Terms (2006) which accordingly applied to this reference.  The seat of the arbitration is London, England.

(D)   The disputes referred to me concerned Sealion's claim for sums said to be due under the Transaction Agreement totalling, after credits, $3,807,538.55, liability for which the respondents ("Marecsa") denied, and Marecsa's counterclaims for unquantified damages and for operating expenses of $320,197.51, liability for which Sealion denied.

(E)   The parties' lawyers provided me with written submissions and copies of the documents upon which they relied and an oral hearing took place between 5-9 May 2014 at the International Dispute Resolution Centre, 70 Fleet Street, London EC4Y 1EU when both parties were represented by solicitors and counsel and both called oral evidence.

**NOW I,** the said Bruce Harris, having taken upon myself the burden of this reference and having carefully and conscientiously read and considered the submissions and documents put before me, and having listened to the evidence and the arguments of counsel, and having given due weight thereto, **DO HEREBY MAKE, ISSUE AND PUBLISH** this my **FINAL AWARD** as follows:

1. **I FIND AND HOLD** that Sealion's claim succeeds in the sum of $3,416,229.21 only and that Marecsa's counterclaims fail and are hereby dismissed.

2. **I THEREFORE AWARD AND ADJUDGE** that Marecsa shall forthwith pay to Sealion the sum of $3,416,229.21 (Three million four hundred and sixteen thousand two hundred and

2

twenty-nine United States Dollars and twenty-one cents) together with interest thereon at the rate of 5% (Five per cent) per annum, compounded at three-monthly rests, from 1st July, 2010 until the date of payment hereunder.

3.  **I FURTHER AWARD AND DIRECT** that Marecsa shall bear and pay their own and (together with VAT as applicable) Sealion's costs of this reference (the latter to be assessed by me on the standard basis in a further award if agreement cannot be reached, for which purpose I reserve jurisdiction) **AND** that Marecsa shall bear and pay the costs of this award which I hereby fix in the sum of £39,779 (Thirty-nine thousand seven hundred and seventy-nine Pounds Sterling) **PROVIDED** always that if Sealion shall first have paid any amount in respect of the costs hereof they shall be entitled to immediate reimbursement from Marecsa of the sum so paid.

4. **FURTHER** Marecsa are to pay Sealion interest on the sums awarded in paragraph 3 above at the rate of 5% (Five per cent) per annum, compounded at three-monthly rests, from the date hereof until the date of payment as regards Sealion's recoverable costs and from the date of any payment to me by Sealion until the date of reimbursement by Marecsa in respect of the costs hereof.

**GIVEN** under my hand this 8th day of August, 2014

...............................................

Sole Arbitrator

3

## "TOISA PISCES"

## REASONS

### for and forming part of

## FINAL AWARD

*Background*

1.  *Toisa Pisces* is a dynamically-positioned off-shore well-testing vessel capable of separating fluid residues generated by oil production so that oil can be recovered and exploited for commercial purposes. The technology involved was developed by Mr Gabriel Delgado, the majority shareholder and president of the respondent in this arbitration, Maritima de Ecologia S.A. de C.V. ("Marecsa").  Prior to Mr Delgado developing this technology, such residues would be collected and flared through flare stacks, a process which was both wasteful and environmentally unfriendly.

2.  Mr Delgado was ultimately able to persuade the Mexican state petroleum company, "Pemex" (sometimes referred to as "PEP"), to be interested in using a vessel with such technology.  Needing a partner in order to be able to tender a properly-equipped vessel to Pemex, Marecsa were introduced to the claimants in this arbitration, Sealion, and at a cost of some $60 million, Sealion bought and converted the vessel then known as *Fresnel*, and she became *Toisa Pisces*.

3.  In November 2002 the parties entered into a number of agreements with a view to enabling Marecsa to tender *Toisa Pisces* to Pemex. These included a collaboration agreement between, amongst others, Marecsa, Sealion and a company called Diavaz (who feature later in the story). In broad terms, Marecsa were responsible for negotiating with Pemex, managing the conversion of the vessel, managing the contract and its performance, coordinating the operation of the vessel jointly with Diavaz  and supplying personnel

to the vessel to operate the processing system, whilst Sealion were responsible for providing the vessel and, jointly with Diavaz, the marine personnel on board.

4.      The tender to Pemex was successful and in 2003 Marecsa were awarded a contract.  That resulted in Sealion and Marecsa entering into a Joint Venture Agreement (JVA) and a Sub-contractor Agreement in early 2003.  The JVA essentially provided that:

    a.      it should prevail over the collaboration agreement in the event of any conflicts;

    b.      Marecsa would represent both parties in dealing with Pemex;

    c.      the parties would work together to try to obtain an extension or renewal of the 2003 Pemex contract;

    d.      the JVA would bind the parties for the duration of that contract;

    e.      if Pemex cancelled the contract at any time, Sealion would have the option of cancelling the JVA by giving notice to Marecsa.

5.      The 2003 Sub-contractor Agreement provided, amongst other things, that the parties would give each other the opportunity of participating in any bids for Pemex work.  Later, however, in June 2008 the parties agreed to delete this provision, a factor which becomes of some importance in the story.

6.      The vessel was delivered at the beginning of January 2004 and on the whole performed satisfactorily.  Before the 2003 Pemex contract expired the parties submitted a further proposal for the continued chartering of the vessel, and on 8 March 2008 Pemex awarded another contract with an initial duration of 18 months, which was subsequently extended to 22 March 2010.

7.     During the course of the 2003 Pemex contract, Marecsa became involved in the provision to Pemex of a similarly functioning vessel, *Bourbon Opale*, working this time with other parties, and in early 2006 they tendered for the provision of a third vessel in partnership with another company.  That company let down Marecsa who, as a result, experienced serious financial difficulties.  One consequence of that was that Marecsa told Sealion that they had not received certain payments from Pemex when, as a matter of fact, they had done so but had used the cash to pay other debts.  By the time the parties came to deal with this situation (as explained more fully below) the total involved was approximately $6.5 million.

8.     At the end of May 2008 the parties met in New York[1].  At this meeting Mr Delgado admitted that he had lied.  According to Sealion it also became apparent that Marecsa had over-charged them in respect of expenses that had not, Sealion said, in fact been incurred.[2]

9.     Sealion said was that they decided not immediately to pursue Mr Delgado or his company criminally or to seek full payment of the outstandings on certain conditions which were set out in an agreement of 3 June 2008 ("the Transaction Agreement").  However, Marecsa soon fell into breach of the Transaction Agreement in what Sealion said were serious respects, as a result of which Sealion's prospects of recovering what was due seemed precarious.  Sealion then, in November 2009, agreed to give Marecsa further indulgence by agreeing temporarily to reduce certain agreed monthly payments.  Although a draft formal

---

[1] According to Mr Delgado's witness statement this meeting was arranged at his request so that he could explain the situation to Sealion.  The evidence of Mr Richard Baldwin, a director of and legal advisor to Sealion, was that Mr Delgado had been "caught with his pants down" and it was Sealion who required Marecsa to explain why hire remained outstanding under the 2003 Pemex contract, as a result of which Mr Delgado suggested that they meet.  Certainly Sealion's suspicions were such that their Mexican lawyer, who attended the meeting, deliberately placed a copy of the Mexican Criminal Code on the meeting room table so that Mr Delgado could see it.

[2] The amount involved at the time appeared to be in the region of $900,000.  This matter forms the subject of a distinct dispute to which I refer later.

addendum to cover this was drawn up, it appears not to have been executed, but this was probably because its terms were clear from the exchanges.

10.    Marecsa failed to comply even with the November 2009 agreement. In early 2010 the expiry of the second contract with Pemex was nearing.  Sealion faced a difficult predicament in that Marecsa could not be trusted, but without a further contract for *Toisa Pisces* with them, Sealion ran the risk that they would lose the opportunity of both enabling and securing Marecsa's repayment of the outstandings.

11.    Finally, Sealion said, they decided that they were prepared to bid for a further contract, but only on very clear terms which were set out in an addendum ("Addendum No. 1"), the detailed provisions of which I set out later.  This Addendum was, Sealion said, made expressly conditional upon Pemex awarding a 3-year direct contract at a rate of at least $67,000 per day, the parties' intention being that in the absence of any such contract the Addendum would be treated as if it had never existed.  That, said Sealion, would lead to the parties reverting to the Transaction Agreement as varied by the November 2009 arrangement.

12.    In fact, in circumstances I shall set out in more detail below, it was not possible to obtain a 3-year contract with Pemex; Marecsa continued to fail to pay in accordance with the November 2009 arrangement and the provisions of Addendum No. 1, and in the event Sealion decided to seek other ways of obtaining business with Pemex for the vessel.  Ultimately, in early 2011, Pemex awarded a 22-month contract to Diavaz and Sealion.

13.    In the interim, in May 2010 the vessel had been chartered to BP for 3 months to assist in the *Deepwater Horizon* disaster.  Marecsa suggested that this caused Pemex to put the process of awarding a

contract on hold and, indeed, that Sealion had asked that this happen.

14.     Against this background, Sealion claimed a total of $3,807,538.55. That was made up of $3,190,811.95 agreed on the face of things to be due under the Transaction Agreement, plus $831,309.34 claimed in respect of the alleged overcharging referred to above in paragraph 8, less $118,400.06 commission and $96,142.68 operating expenses.  Of the $831,309.34, Marecsa had admitted that it had overcharged $444,916 but not the balance.  In negotiating Addendum No. 1 (and as reflected therein) the parties agreed to settle this part of the claim at $440,000, but because they said Addendum No. 1 was - or became - null and void, Sealion claimed the whole $831,309.34.  Marecsa maintained that Addendum No. 1 remained binding, alternatively that even if it did not the agreement as to $440,000 was distinct and did not fail with the Addendum.  In the further alternative they said the difference between the sum claimed and $440,000 was subject to a further independent audit, the carrying out of which was a condition precedent that has not yet been satisfied, or that Sealion is estopped from asserting that more than $440,000 is due.

15.     Marecsa denied liability for Sealion's principal claim, and counterclaimed on the basis that Sealion's withdrawal from the negotiating process in July 2010 was a breach of contract which caused Marecsa loss because, they said, Pemex would otherwise have awarded them a contract.  It was agreed that if this counterclaim succeeded the quantum of it would be deferred for later determination.  Marecsa also sought the difference between the $96,142.68 operating expenses which Sealion admitted and the amount of $320,197.51 which they said was due in that respect.

16.     At this point it is necessary to set out in some detail the history of the parties' relationship at the relevant times.

*The Transaction Agreement*

17.   On 30 May 2008 Mr Baldwin of Sealion and Mr Delgado signed a Memorandum providing, in part, as follows:

> Amount owed $6.5million consisting of hire not paid as a result of Marecsa not paying Sealion the hire received by Marecsa from Pemex due to Sealion, interest... and overcharges revealed by audit in the amount of $911,309.34.

> Credits against the foregoing:

> ...

> Totals roughly $1.5million.

> Balance of approximately $5million to be paid $300,000 per month starting March, 2009 until the balance has been paid from the earnings of the *Bourbon Opale* contract.

> Both the Pisces and Opale earnings to be paid pursuant to Assignments/Trust Agreement; in the case of the Pisces Trust Agreement to be established within 60 days and Opale Trust Agreement to be establish within 90 days from today.

> …

> Any breach of this agreement whether before or after the Trust Accounts are established shall give Sealion the right to immediately commence civil and/or criminal proceedings and to take whatever other action is necessary to protect its interests and to immediately collect the balance due.

> ...

> This Memorandum is to be formalised by a fully executed written agreement no later than Tuesday 3 June 2008.

18.   The Transaction Agreement anticipated by that Memorandum was signed on 3 June 2008.  The preamble provided, in part:

> ...

> Whereas, on or about 21 May 2008 Marecsa admitted that it had failed to comply with the above methods and instructions for payment of the charter hire, thereby breaching the Joint Venture Agreement; and

> Whereas, Marecsa acknowledges that Marecsa received from PEP [Pemex] all the charter hire due and payable ... and

> Whereas, Marecsa acknowledges that Marecsa failed to pay said charter hire to Sealion as required; and

Whereas, Marecsa acknowledges that Marecsa owes to Sealion USD4,900,000 … in outstanding charter hire;

Whereas, as a result of an audit by Moore Stephens ... Marecsa was found to owe Sealion USD911,309.34 ... which amount Marecsa disputes (the "Disputed Amount") ... and

Whereas, Marecsa desires to pay Sealion the outstanding charter hire, overcharges and expenses due to Sealion owed by Marecsa together with past and future interests thereon; and

Whereas, subject to the review of the Disputed Amount, Marecsa agrees that said amount owed by Marecsa to Sealion is USD6,500,000... inclusive of interest, and Marecsa agrees to pay this amount to Sealion as set forth in this Transaction Agreement; and

Whereas, on 2 May 2008, Marecsa was awarded a contract... by PEP for services of the vessel's *Bourbon Opale, ...* during which PEP will pay USD105,606,114.88 ... (the "*Bourbon Opale* Contract")

**Now therefore it is mutually agreed as follows:**

1) Subject to the review of the Disputed Amount, Marecsa owes to Sealion for past due charter hire... the amount of USD6,500,000 ... inclusive of interest.

2) The amount of USD6,500,000 ... owed by Marecsa to Sealion shall be paid and/or credited as follows:

   a) Marecsa will forego and Sealion accepts as payment towards the sum owed by Marecsa, the commissions due to Marecsa from Sealion for the Pisces contract in the amount of USD124,000... and

   b) Marecsa will forego and Sealion accepts as payment towards the sum owed by Marecsa, expenses up to and including March 2008 due to Marecsa from Sealion relating to the Pisces contract in the amount of USD44,000 ... in the understanding that this amount could increase up to the sum of $90,000 ... once Sealion receives and reviews additional expense supports... and

   c) Marecsa will forego and Sealion will accept as payment towards the sum owed by Marecsa, the commissions earned or to be earned by Marecsa from Sealion relating to the New Pisces Contract in the amount of USD1,263,500 ... and

   d) Marecsa will pay to Sealion USD300,000 per month commencing 18 March 2009, until the outstanding balance of the USD6,500,000... owed to Sealion is paid in full

      ...

3) Marecsa will assign the earnings from the New Pisces Contract to Sealion with the earnings being deposited in a

7

trust account, and said Assignment/Trust Agreement to be completed within 60 days of the execution of this Transaction Agreement, and so agreed and executed by PEP.

4) In order to comply with Article 2(d) herein, Marecsa will assign all monthly hire payable by PEP on the Bourbon Contract, specifically on the vessel Bourbon Opale, to Sealion with said total earning being deposited in a Trust Account ...

5) Marecsa will provide to Sealion all of the documents relating to the Bourbon Contract including but not limited to the award of the contract by PEP ...

6) To address the dispute of Marecsa to the Moore Stephens audit, Sealion will appoint ... an independent international accounting firm to verify/reconcile the audit ...

7) If as a result of said verification/reconciliation ... Marecsa is entitled to a reduction on the Moore Stephens audited amount of USD911,309.34 ... Sealion agrees to credit such reduction to Marecsa.

8) Marecsa is to immediately upon receipt of charter hire payments from PEP under the New Pisces Contract or any payments from PEP under the Pisces Contract, transfer such payments to ABN account ... with instructions to ABN to remit said payments to Sealion...

9) If Marecsa enters into any new contracts and there are profits derived therefrom, Marecsa will use said profits to reduce the amount due to Sealion by accelerating and increasing the monthly payments from Marecsa to Sealion stated herein.

10) In the event Marecsa is successful in obtaining financing and/or capitalisation of Marecsa, it shall use said financing/capitalisation to reduce the amount due to Sealion to maximum degree possible.

11) ...

12) Marecsa will additionally provide, on demand of Sealion, to Sealion the password of Marecsa's account webpage on the website of PEP, and said password shall not be changed.

13) In the event Marecsa breaches this Transaction Agreement before and/or after each of the Assignments/Trust Agreements are in place for the New Pisces Contract and the Bourbon Contract, Sealion has the right to pursue Marecsa both criminally and/or civilly, to immediately claim the balance still owed to Sealion, and to take any other action to protect its interests and/or recover the balance due in law and/or equity in whatever Court and/or jurisdiction it deems necessary or appropriate in its sole discretion.

...

*Implementation of the Transaction Agreement*

19. Negotiations in respect of implementing the detail of the Transaction Agreement continued between Sealion and Marecsa's lawyers over a number of months.  A number of difficulties arose such that on 20 March 2009 Sealion wrote to Marecsa's lawyers:

> Notwithstanding the above, we would be remiss if we did not remind you that we provided you with a draft of the BO [Bourbon Opale] Trust Agreement on 10 October 2008 ... since then, we have repeatedly requested your/your client's comments ... yet you have continued to ignore us or made further empty promises
>
> As you further know, we also provided to you on 10 October the Assignment of Earnings, on which you gave your comments ... promptly. As such, the draft provided to you ... should not require any further comment, only a signature by your client ...
>
> It is clear from the above that you have had an extraordinary amount of time to review, discuss, comment, revise, etc. the BO Trust Agreement, but have chosen rather to ignore your/your client's obligation to do so and now, via a nonchalant email, attempt to force Sealion to accept that you and your client are unable to meet the expiration of the Pemex authorisation.
>
> ...
>
> Sealion has been extremely patient with your client and we remind you that notwithstanding the lack of the above documentation your client, in accordance with the Transaction Agreement, is obliged to pay USD300,000 per month commencing in March 2009 for which month Sealion agreed to a pro-rated portion thereof (to be received within the first week of April, with the full amount of USD300,000 to be paid in full every month thereafter, commencing in the first week of May.

(The reference to "Pemex authorisation" was made because Pemex had authorised an assignment of earnings, but that authorisation contained an expiry date.)

20. On 27 March 2009 Sealion wrote to Marecsa:

> ...
>
> Now that you and your attorney ... have allowed the Pemex authorisation for the BO contract to expire, we expect you as promised to file a new request with Pemex ASAP ...
>
> We trust the above is clear and we do not have to repeat how serious this matter is and how imperative it is that you comply with the Transaction Agreement.  Please confirm receipt of this email and advise of your/Marecsa's compliance with same.

21.     The next significant steps in the story occurred in early June.  On 2
        June Sealion wrote to Mr Delgado:

> Can you please advise/confirm that payments were received from Pemex
> on the Bourbon Opale contract... Please also advise when transfers of
> monies received under those payments will be made to Sealion.

The reply, on 4 June, was:

> As advised during our meeting last week, the Mexican Revenue Services
> has decided to impose a 35% reduction to the new contract, applying such
> percentage also to the VAT ...
>
> This, as explained during our meeting is having a very severe effect, with
> a 35% reduction any income received is simply not enough to pay but the
> Vessel charter' the remaining funds that are not enough to pay the
> corresponding VAT, much less to operate.
>
> It has been verified that the February income was received, payment to
> the Bourbon Opale owners was made, after which only 34,000 was left,
> which as mentioned, is not enough even for the VAT.
>
> ...

Sealion responded:

> The below [i.e. the above message] is noted with some dismay as item 4)
> of the Transaction Agreement ... clearly states; "Bourbon Opale ... which
> shall provide that Sealion is paid the first USD300,000 of such monthly
> sums and the balance of said monthly sums being released to Marecsa".
> By paying the owners of the Bourbon Opale first you have, by your own
> admission, breached the terms set forth in the Transaction Agreement.
>
> You do not have the right to pay Bourbon prior to first paying Sealion the
> agreed USD100,000 pro rata of February.  We expect you to remedy this
> breach by arranging for USD100,000 to be remitted to Sealion.
>
> ...

22.     Following an explanation given by Mr Delgado as to various alleged
        difficulties in relation to payments under the *Bourbon Opale*
        contract, Sealion agreed on 9 June, without prejudice to the
        Transaction Agreement, to a 30-day waiver of Marecsa's obligation
        to pay the monies due from the *Bourbon Opale* contract in
        accordance with the Transaction Agreement.

23.    Negotiations as to the *Bourbon Opale* Trust document required by the Transaction Agreement continued, Pemex having issued a fresh authorisation for assignment which expired on 7 September 2009. On 31 August there was something of a bombshell: Sealion's Mexican lawyer reported, following a meeting with Marecsa's lawyer, that it had become apparent that the *Bourbon Opale* contract was not going to be assigned to Sealion but rather to a new trust under an agreement to be executed between the *Bourbon Opale* owners and Marecsa; and that Marecsa intended to execute a new trust agreement with Sealion "where the revenues of Marecsa are going to be deposited from the New BO Trust" - and that Sealion would be entitled only to $120,000 each month.  Sealion of course objected strongly.

24.    A meeting took place between Mr Peri Callimanopoulos of Sealion and Mr Delgado on 7 October 2009 at which various matters were discussed.   Mr Delgado indicated a willingness to increase the indicated $120,000 per month by at least $50,000 once another ship, *Eco III*, had started performing and he was receiving payments in respect of it.  Mr Callimanopoulos's note of the meeting included a reference to discussion on a possible new tender for *Toisa Pisces*, and said:

> ... according to PD, it will be a 3-5 year contract to be released in late November of this year... Pemex has raised the possibility of a 6 months + 6 months + 6 months direct award, but such direct award would allow other parties to prepare for an eventual long term tender.

25.    In line with what was said in that meeting, on 31 October, Mr Delgado emailed:

> After considering our cashflow ... we need to advise that ... we will be in a position to increase 50,000 to the payment for the Toisa Pisces Contract debt; if we go beyond these figures, we will be placing operations at risk.

> The 120,000 US will start this month, November 2009, the additional $50,000 will start upon receiving payments for the ECO – III contract, expected January/February 2010.

26.   Marecsa were facing, Mr Delgado said, a problem with the Mexican Tax Authorities which limited their ability to pay, but once that problem was cleared they said they would increase payments to $300,000 per month.

27.   Sealion prepared and sent to Marecsa's lawyers a draft addendum to the Transaction Agreement dated 19 November 2009.  It appears that this was agreed in substance although never signed. Substantially its content was reflected in a message from Mr Delgado to Mr Callimanopoulos on 17 November in which he said:

> As per our previous conversations, and our telephone call this morning, we can confirm that we will start paying Sealion 120,000 US/month, starting November towards the outstanding charter for the first Toisa Pisces contract.  Once the ECO-III vessel starts service, which we expect end November 09, and funds start to be paid, we will be in a position to increase our payment additional 50,000 US/month.  We expect first payment January/February 2010.

> Also, and as we have explained, the Mexican Revenue Services will keep collecting from the Bourbon Opale for the second half 2008, once relevant documents are received we will forward a copy; nevertheless as soon as the outstanding to the Revenue Services is cleared, we will increase the payment to 300,000 US/month.  As discussed, we will look into a possible increase in such figure, but can not confirm other figure and possibility until we are close to clear the debt with RSM and be able to determine additional amounts.

28.   In December 2009 there were meetings about the Disputed Amount.  I may pass over those in the light of my conclusions on that matter, which depend on negotiations leading to the Addendum to the Transaction Agreement, to which I now turn (though I only deal with the question of the Disputed Amount at the end of these Reasons).

*Negotiating Addendum No. 1*

29. The parties also started discussions about the basis on which they might seek a further contract from Pemex.  After a number of email exchanges over some 4 months, on 22 February 2010 Sealion sent to Marecsa a draft Addendum No. 1 to the Transaction Agreement. That set out their proposed terms for renewal so that they and Marecsa could seek a further contract with Pemex. 2 days later, Sealion wrote to Marecsa clearly stating that they would not give the latter authority to enter into any discussions with Pemex until they had an Addendum signed (see paragraph 86 below). Marecsa commented on that draft, through their lawyers, on 8 March.   10 days later Sealion responded with a revised draft, and on 23 March Mr Delgado sent Mr Callimanopoulos an executed Addendum No. 1 dated that day.   Sealion returned this Addendum, duly signed, to Marecsa on 7 April.   This Addendum referred to the Transaction Agreement of 3 June 2008 and, so far as relevant, it provided:

> ….
>
> Whereas, for circumstances allegedly beyond the control of Marecsa, Marecsa has not been able to comply with the above-mentioned Article 2(d) and has failed to comply with Article 4 of the Transaction Agreement; and
>
> ….
>
> Whereas the Parties agree to submit a proposal for the Direct Award on or about April 10th 2010 to PEP for the continued chartering of the Vessel on the conditions set forth in this Addendum; and
>
> Whereas the Parties now agree to settle the Disputed Amount in the amount of USD440,000 ... to be paid by Marecsa to Sealion in addition to and as part of the current outstanding balance owed by Marecsa ...; and
>
> Whereas, without prejudice to the original agreed terms of the Transaction Agreement, specifically Articles 2(d) and 4, on or about November 2009, the Parties agreed that Marecsa would commence paying Sealion USD120,000 ... per month from the Bourbon contract ...; and
>
> Whereas, Marecsa made one Amended Bourbon Payment in December 2009; and
>
> Whereas, for circumstances allegedly beyond the control of Marecsa, Marecsa has not been able to make any further Amended Bourbon

Payments but rather has made one payment each of USD60,000 ... in January 2010 and March 2010; and

Whereas, without prejudice to the original agreed terms of the Transaction Agreement, specifically Articles 2(d) and 4, the Parties agree that Marecsa will pay to Sealion the amounts, and at the times, set forth in this Addendum; and

Whereas the Parties agree that in the event that Marecsa, for whatever reason, does not comply with any or all of the terms of this Addendum, Sealion shall have and may exercise any and all of its rights under the Transaction Agreement, and the total amount outstanding from Marecsa to Sealion will become immediately due in accordance with the Transaction Agreement.

**NOW THEREFORE,** in consideration of the Recital paragraphs which are fully incorporated into this Agreement, the promises and mutual covenants contained in this Agreement ... the Parties  agree as follows:

1. The current balance owed by Marecsa to Sealion pursuant to the Transaction Agreement less the Disputed Amount is USD3,190,811.95 ...

2. The total current balance, including the Audit Settlement amount, owed by Marecsa to Sealion under the Transaction Agreement is USD3,630,816.95 ... ("Marecsa Outstanding Debt")

3. Marecsa will pay to Sealion USD120,000 ... per month from the Bourbon Contract, commencing May 2010 towards the Marecsa Outstanding Debt.

4. Commencing May 2010, Marecsa will increase its monthly payments to Sealion by an additional USD50,000 ... per month towards the Marecsa Outstanding Debt.

5. Marecsa and Sealion will participate jointly in a proposal to PEP for a Direct Award on the following terms:

   ...

   d) Marecsa will only offer the vessel to PEP under a joint contract with Sealion Shipping Limited.

   e) On the basis of a Three (3) Year Direct Award; in addition to the amount due under (b) above, Marecsa will be entitled to receive the following...:

      1. A fixed amount of USD1,000 ... per day if the day charter rate on the direct award does not exceed USD42,000 ... per day

      2. If the daily charter rate is above USD42,000 ... then Marecsa is entitled to USD1,000, plus Ten (10) Percent of the charter rate differential between USD42,000 ... and the charter rate achieved up to USD65,000 ...

3.  For daily charter rate above USD65,000 ... then Marecsa is entitled to the amount due under item 2) above plus Thirty-Three and One Third... Percent of the difference of the daily charter rate achieved and USD65,000 ...

4.  For the avoidance of doubt, the balance of the charter rate ... shall be paid to Sealion.

Until the Marecsa Outstanding Debt is satisfied and as long as monthly payments of USD120,000 ... from the Bourbon hire and the additional USD50,000 from the ECO III hire are still being made by Marecsa to Sealion then Marecsa is also to pay and/or credit Sealion 50% of what is earned under 5(e) above.

If Marecsa fails to make the outstanding payments as above then 100% of what is earned under (5)(e) above becomes payable and/or credited to Sealion to pay the Marecsa Outstanding Debt.

...

8.  This Addendum is made, entered into, and agreed without prejudice to the terms and conditions of the Transaction Agreement, and rights of the Parties thereunder.  For the avoidance of doubt, this Addendum is not, and is not to be construed, in any way, a waiver of any of Sealion's rights under the Transaction Agreement, including but not limited to Article XIII of same.

9.  This Addendum will become valid, effective, and in full force only if PEP directly awards a contract to Marecsa and Sealion for the Toisa Pisces for a duration of 3 years on terms substantially similar to the current contract... and at a rate of USD67,000 ... per day pro rata, failing which this Addendum will be considered null and void and without prejudice to the Transaction Agreement.

10. Notwithstanding Clause 9 herein if the rate for the Direct Award is less than USD67,000 ... per day pro rata but is in excess of USD65,000 ... per day pro rata, then Sealion will consider such rate and discuss same with Marecsa before deciding, in its sole discretion, whether to accept or reject such rate.  If such rate is not agreed this Addendum will be considered null and void and without prejudice to the Transaction Agreement.

11. All other terms and conditions of the Transaction Agreement remain unaltered and in full force and effect.

30. The substantial reduction in the debt from the figure in the Transaction Agreement to that in Addendum No. 1 was not due in substance to payments by Marecsa, which were minimal; rather it was because of credits which, in the interim, Sealion had accepted had to be given following vouching.

15

*Things start to go wrong*

31.    On 29 March Marecsa put in a tender to Pemex with 3 alternatives, namely for 1 year at $90,000 per day, for 2 years at $80,000 per day and for 3 years at $69,500 per day.  The idea of the first two alternatives was to drive Pemex to the third, the rate for which was so much more attractive.  On 9 April Mr Delgado advised Sealion that he had been pursuing the matter with Pemex and that it was "all within their internal process, mainly to determine their budget distribution.  We have been advised that the 3 year contract is being considered."

32.    However, on 13 April Mr Delgado received information that suggested that Pemex were only interested in 18 months, but he does not seem to have passed that information on to Sealion.  Instead, on 14 April Sealion's Mexican lawyer reported, after a number of meetings with Pemex, that:

> Pemex will issue the direct award for the rest of the year in favour of the Pisces and prepare the Tender.

On being asked whether there was a possibility of a contract for 3 years, Sealion's lawyer indicated that he understood not.  The same day Mr Delgado advised Sealion:

> We had meetings with PEP today, and several points came out.  The rates for the 1 and 2 years are not as per their budget and find hard to award.
>
> ...
>
> The 3 year contract may take longer to award considering that a multi-year contract takes longer to prepare and obtain the resources ... at present the schedule, tied to the available resources may be sufficient for 18 months.  I believe that this is the reason why PEP is looking for a revision to the rates in case the contract is shorter than 2 years.
>
> ...

33.   Unknown to Sealion, on 16 April a Mr Dan Sullivan , an intermediate broker (but who, on all the evidence, plainly sided with Mr Delgado even, as it seems to me, contrary to Sealion's interests in this affair) emailed Mr Delgado, apparently after a conversation with Sealion, to the effect that he had advised Sealion:

> ... 1)   Pemex was very upset with the price indications, 2) they came very close to walking away ..., prepared to drop the ship and go the tender route, and 3) what you can do is $67m for 18 months.
>
> I recommended that they leave you the authority to close it at that level, and ask if you could attempt to obtain any minor improvement in the rate or period – maybe 500 and 24 months being the outer range of what "might" be possible, but not to count on that.
>
> Bob [of Sealion] asked about a longer period for less – 3 years for 65,000 – and I told him it was a reasonable approach, but I did not know. *Frankly, if they do give you that option I would avoid it.  Marecsa's cashflow is better off at the 67 than 65, and the period is not important to you given the idea is to move promptly to encourage Pemex to tender a new build for replacement*. [Emphasis added.]

34.   That was a strange message.  It stood in isolation, in that no disclosure was given of any other related communications with Mr Sullivan.  The last paragraph suggests that Mr Delgado had some idea of trying to get Pemex to use a newly-constructed vessel instead of *Toisa Pisces* within the near future and so would have no interest in a long-term contract with Sealion and Pemex.

35.   Cross-examined on this message, Mr Delgado's evidence was most unsatisfactory.  He could not explain it beyond blankly denying that it reflected his intentions.  The ideas in it were, he said, Mr Sullivan's alone, but I find that inconceivable given their nature and that Mr Sullivan plainly knew something of Marecsa's financial difficulties.  Further there must have been prior and subsequent exchanges which were not disclosed.  In addition Mr Delgado denied having had a conversation with Mr Sullivan before the message was sent, saying that it followed from a conversation between the latter and Sealion alone; and he maintained - quite improbably - that he

had no subsequent conversation with Mr Sullivan, not even in order to deny that his interests were as stated.

36. I shall deal with Mr Delgado's general credibility later (see paragraph 62), but at this point think it right to say that I am satisfied that it was in Marecsa's interests only to have a 1-year contract for *Toisa Pisces* because they thought that thereafter they could get a deal that was better for them with a new building, and that Mr Delgado misled Sealion with information that Pemex were only interested in such a short-term deal, when the truth was that they were looking for something longer even at that stage.

37. On 15 April Pemex wrote to Marecsa in part as follows:

> Commercial offer: the daily rate offered is not accepted by PEP as the daily charge for this vessel [the last contract] was in the region of USD70,000.00/day.
>
> Therefore a rate below this figure could be of interest to PEP in considering a technical and financial proposal.
>
> The period we are interested in for services by the vessel "Toisa Pisces" is one year, as the programme is counting on the services of this vessel.

38. After this Mr Callimanopoulos of Sealion spoke to Mr Delgado and then reported, internally, that Pemex had advised:

> ... that they only have the budget for a year.  Pemex intends to prepare a tender for 3-5 years by year end and the idea would be for the Pisces to win said tender (the timing of the end of the 12 months and commencement under the tender will match.)
>
> GD [i.e. Mr Delgado] says they had been speaking with everyone they could at Pemex but the answer is always the same, in that the budget is not there for a longer period.
>
> Pemex has all of the authorisations in place for a direct award and GD states that commencement would be almost immediate – 8-10 days.
>
> As far as the rate is concerned, GD feels that the maximum achievable rate would be $69,500 as this is lower than our previous rate of $70,000.
>
> I made the argument that since our previous contract was for 18 months at $70,000 and this one is only twelve there should be a premium to the previous rate.  GD claims he has made this argument to Pemex without success.

39.   That was on 21 April, and following internal discussions Mr Callimanopoulos then sent a further email to his colleagues reading:

> Further to my last, we are giving GD the go ahead to book 12 months, at $69,500 or better.  He will submit a letter to Pemex today followed by a meeting tomorrow ... he said he would provide us with a copy of the letter he submits and keep us closely posted.
>
> ...

40.   In fact on 22 April Marecsa made a proposal to Pemex for a year's contract at $69,600 per day.

41.   Sealion realised that in view of the changed circumstances, Addendum No. 1 needed to be altered and they set about a redraft. Meanwhile, the indications from Mr Delgado on 26 and 27 April, followed by a message on 29 April, were that Pemex were preparing to contract for a year starting from 15 May.

42.   A revised Addendum No. 1 was sent by Sealion to Marecsa on 3 May.  This revised draft changed paragraph 5e) so that it began "On the basis of a One (1) Year Direct Award ... ".  In clause 9 the period was changed from 3 years to 1 year and the rate from $67,000 to $69,500, whilst in clause 10 the rate of $67,000 was also changed to $69,500.

*The* Deepwater Horizon *intervenes*

43.   On 20 April 2010 the *Deepwater Horizon* oil spill began.  On 3 May Sealion were approached by brokers who said that BP had a dire need for a vessel such as *Toisa Pisces*, but they assumed she could not be made available promptly for a few weeks.  Sealion answered confirming that, and saying that the earliest start date for Pemex was 15 May.

44.     However, it appears that Sealion then took steps to prepare themselves in case there was a possibility of using *Toisa Pisces* to assist BP, in particular by arranging for her to leave Coatzacoalcos where she was at the time, apparently in order to avoid the Mexican national holiday on 5 May delaying matters.

45.     Mr Delgado expressed great concern, particularly in relation to employees of Marecsa who were allegedly left on the quayside at Coatzacoalcos and others who were on board when the ship sailed. In addition, however, he said that he had told Sealion that *Toisa Pisces* would be required by Pemex for the third week of May but that he had, on 7 May, received a call from Pemex who were, he said, "extremely concerned on availability" and that this was going to delay the start of any further contract with them.  Having considered all the evidence I do not accept this.

46.     Sealion's response in part was to the effect that the vessel had not in fact left Mexican waters and that, as regards Pemex, Mr Delgado had been indicating an early start of a new contract for some time without any real progress being apparent.  That was indeed the case, and as was said for Sealion, the more promises of a future event that are received without any real progress being made, the less credible such promises become.

47.     Around 10 May, Mr Delgado was repeatedly complaining that Sealion had not been transparent with him about the movements of the vessel, something which they denied, and which I do not find to be the case.  They maintained, and I accept, that they had kept him closely informed about the possibility of working with BP, although at that stage that seemed to be unlikely.  Meanwhile they were pressing him for news about a new contract with Pemex and in particular for copies of all written communications between Marecsa and Pemex (which Mr Delgado had said he had passed to them, but this was not so) and a copy of a specific message from Pemex

concerning the contracting process which they had not seen.  Mr Delgado only complied with those requests some 12 days later (see paragraph 51 below) and then, I believe, only partially.

48.   On 12 May Mr Delgado advised Sealion that based on conversations the previous evening, Pemex was apparently considering 30 May as a start date.

49.   Mr Callimanopoulos spoke to Sealion's Mexican lawyer on 13 May following a meeting he had had with Pemex.  The lawyer, according to an internal email Mr Callimanopoulos sent on 14 May, started by saying that he got mixed signals from Pemex, as follows:

> 1.   Pemex want the Pisces back working asap.
>
> 2.   The award will be issued "shortly" for one year.
>
> 3.   The delay is, according to [the lawyer], due to people in Pemex not wanting to give the contract to Marecsa.
>
> 4.   The reason that the award is only 12 months is due to the same reasons as 3, in that Pemex wants to limit their exposure to Marecsa.
>
> 5.   According to [the lawyer], if we were to appear with another partner we could obtain a minimum 2 year contract on the same terms as the 12 month.
>
> ...
>
> [The lawyer] is trying to bring the commencement forward, but he has been told by Pemex that asserting pressure to do so could complicate the process and prove counterproductive.
>
> I pointed out to [the lawyer] there is a lot of uncertainty with regards to the above, on which he agreed.  I also pointed out that it does not help us recoup owed moneys from GD, which he also accepted.
>
> [The lawyer] asked if I would be willing to discuss the possibility of working with [another company] and I said that it is highly unlikely that we would be interested in switching horses at this stage but I would pass the message on ...

50.   In an exchange on 14/15 May, Mr Callimanopoulos asked Mr Delgado whether the award would be issued on the first of those dates, to which Mr Delgado replied the following day that due to

Pemex's uncertainty on the vessel's availability, Pemex "had suspended the chartering of the vessel and not until we got the confirmation that the vessel was available... [Pemex] could once again start the process.  I have been advising that it could be delayed 2-3 weeks ... therefore the award/start is expected end of May to early June".

51. If indeed it was the case that Pemex had stopped working on the preparation for a new contract, it is surprising that on 22 May Mr Delgado sent to Mr Callimanopoulos a substantial collection of documents which he had received from Pemex on 9 May and which were all attachments to the intended contract with Pemex.  It is also curious that it took Mr Delgado almost two weeks to forward those documents despite the specific requests made by Mr Callimanopoulos on 10 May (see paragraph 47 above).  As it is, however, I am satisfied on the evidence I saw and heard that Pemex's internal processes towards a fresh contract continued, and that - subject to the very important question of Marecsa's relationship with Pemex - it was only the start date for any new contract that was in question.  Further support for this view appears below.

52. Negotiations with BP had led to a situation where, by 17 May, it looked as if a charter was likely to be agreed shortly.  Accordingly, on 19 May at the instance of Sealion, a telephone call took place between Mr Gregory Callimanopoulos, the chairman of Sealion's parent company, and Mr Delgado.  Mr Callimanopoulos said, and I accept, that this was to explain the situation to Mr Delgado and to give his personal assurance that Sealion still wished to offer *Toisa Pisces* to Pemex to start work after completing her charter with BP. He said that he explained to Mr Delgado that Sealion was close to concluding a charter with BP and that if this happened Toisa Pisces would be required to sail almost immediately.  Mr Delgado was

asked to pass this information to Pemex and to explain that despite the charter to BP, Sealion was still keen that on redelivery she should work with Pemex.  Mr Delgado was therefore asked to obtain the agreement of Pemex for the start of the new contract to be delayed pending redelivery by BP.  It was suggested that allowing the vessel to work for BP could generate good publicity for Pemex.

53.   Marecsa said that during this conversation, Mr Gregory Callimanopoulos asked Mr Delgado to request Pemex to postpone further negotiation of a new contract until the BP charter was finished.  This, Mr Callimanopoulos denied.  Notes made by a colleague who overhead the conversation support Mr Callimanopoulos's account rather than that of Mr Delgado.  The evidence clearly showed that Pemex's internal processes continued.  Further, a telephone note made by Mr Peri Callimanopoulos following a conversation on 20 May with Mr Delgado read:

> Initial comments from Pemex are positive.  At ease.  Keep them posted.

54.   A charter with BP was indeed concluded and on 21 May Mr Peri Callimanopoulos emailed Mr Delgado:

> We have now committed the Pisces to BP for a period of three months ... please advise [Pemex] of what has transpired.  In the meantime, please continue to press Pemex for the direct award, with a start date approximately three months from now.  In that regard, have you received the draft contract, as we would like to start reviewing same.
>
> ...

55.   It was in response to that, apparently, that on 22 May Mr Delgado for the first time sent to Sealion the "files received in preparation for the ... new contract"  (see paragraphs 47 and 51 above).

56.   In a telephone conversation between Sealion's Mexican lawyer and Mr Peri Callimanopoulos on 24 May, according to the latter's notes, the lawyer said that there were delays inside Pemex, that Marecsa

had been slow to press them in relation to the contract, that some people were saying nothing would be awarded and that Marecsa had been slow with the paperwork.  There was no hint of the BP contract causing any problem.

57.   An internal Marecsa email of 28 May noted that "the administrative procedure to assign the contract to the TPS [*Toisa Pisces*] is continuing, albeit slowly ... ", that there was some risk that Pemex might go out to tender rather than awarding a direct contract, and that *Toisa Pisces* would be available between September and October.

58.   When sending to Sealion, on 2 June, a copy of the letter he had written on 25 May to Pemex advising of the BP charter, Mr Delgado said:

> As per the dates, PEMEX had planned for a June 5th start, their process has been placed on hold, and have asked that we keep them advised on progress with BP.

It is clear to me that Mr Delgado, at the time, had no problem with the fact that the vessel was not going to be available for some time: indeed, that might rather have suited him if, as I consider, he had plans for the future that did not involve Sealion and the vessel.

59.   Late in May 2010 Mr Peri Callimanopoulos met, in Mexico,  Mr Avila of Pemex.  He held a very senior position and was highly influential at the time in the awarding of contracts such as that with which I am concerned.  Mr Callimanopoulos told Mr Delgado in advance that this meeting was to take place, and subsequently telephoned, on 1 June, to report on it.   There was much dispute between these gentlemen as to who called for the meeting and as to what was said during it, as well as regarding what was said during the subsequent telephone conversation.  In addition Marecsa sought to cast adverse aspersions as to Mr Avila's experience and character.

60.	Despite all this, however, it is clear to me that at the very least, Mr Avila was at the time, and was perceived as being in a position of considerable power in connection with the awarding of contracts of this kind, that he told Mr Callimanopoulos that Pemex had recently rescinded a contract with Marecsa for another vessel and that Pemex were unhappy with Marecsa.  Perhaps most significantly I am satisfied that Mr Avila said something to indicate that Sealion would be better, off in terms of obtaining a new contract, if Marecsa were no longer their partners.

61.	Mr Delgado's contemporaneous note of his 1 June conversation with Mr Callimanopoulos said nothing about this last point.  But in a disclosure list that he prepared and signed months before disclosure was actually given, when mentioning this note, Mr Delgado added - from his recollection of the conversation[3] - a comment "the users [i.e. Pemex] are very unhappy with Marecsa, therefore was recommended to offer via other possible partner.  Gabroel Delgaos *[sic]* comment was that there is an agreement and should be honored."  Beyond the mention in his note that "Clients are very unhappy" there was nothing in Mr Delgado's note to this effect.

62.	Nor did Mr Delgado's witness statement say anything about it; and the point was not raised in Mr Callimanopoulos's cross-examination (which of course preceded Mr Delgado's evidence).  This gave rise to one of the more unfortunate episodes in Mr Delgado's cross-examination, because it was plain that he had sought to mislead his lawyers and thus the tribunal in making his witness statement.  This was, sadly, not the only such example; and this is as good a point as any at which to say that I found Mr Delgado's evidence variously evasive and defensive, sometimes disingenuous and at others simply dishonest[4].  I accept the submission of counsel for Sealion, that I can only accept Mr Delgado's evidence to the extent that it

---

[3] According to his evidence in cross-examination.
[4] This, of course, is entirely consistent with his commercial behaviour throughout this saga.

was given against his interests (and/or is consistent with contemporaneous documentary evidence).

63.   What Mr Avila said to Mr Callimanopoulos fits in with the information Sealion's lawyer had passed on earlier in May: see paragraph 56 above.  No doubt as a result, from that point onwards, at least, Sealion began very seriously to consider the possibility of working in future with Diavaz rather than Marecsa, despite the fact that to do so would make recovery of what Marecsa owed them possibly more difficult.  But they were faced with the prospect that if they did not change horses, or at least (to use the metaphor employed in argument) saddle up another horse just in case, they might not get another Pemex contract at all.

64.   Finally, on 1 July 2010, Sealion emailed Mr Delgado:

> As you know, the Toisa Pisces has been fixed to BP.  The new contract for the Toisa Pisces to work with Pemex after the BP charter has not progressed.  In fact we understand that you are having problems with Pemex regarding your ECO IV contract.  We further understand in this regard that it may lead to your being suspended from doing business with Pemex for two years.  This might explain why there has been no conclusion to the Toisa Pisces contract through you with Pemex.
>
> As you well know we have shown the utmost goodwill working with Pemex through you.  Unfortunately the foregoing, although hearsay, appears to have validity.  We are therefore faced with the distinct possibility of needing to work the Toisa Pisces with Pemex through other third parties.  While regrettable in itself this now seems to be increasingly unavoidable.
>
> Therefore, given the foregoing, at this time, we withdraw the contents of our letter dated 22nd April 2010, to which in any case Pemex have to date not agreed.

That reference was to the letter Marecsa had written to Pemex on 22 April (see paragraph 40 above) offering a 1-year contract at $69,600 per day.

65.   This email drew a response from Marecsa's lawyer in Mexico.  He said that it was because Sealion had been unable to give a delivery date that Pemex had been prevented from finalising their internal

process for the awarding of the contract (referring to "Sealion's lack of response to Marecsa's multiple requests as to when the vessel will be available"), and denied the other allegations.

66. Sealion responded in turn on 6 July in an email which counsel for Marecsa described as "window-dressing"[5], a suggestion which Mr Baldwin of Sealion denied, maintaining that it was to give Marecsa a last chance to prove that they could get an award from Pemex. The message read:

> First, we must correct you and deny the allegations set forth in your paragraphs numbered 1, 4 and 5 as being factually incorrect. Moreover we totally reject the suggestion set forth in your paragraph 6. Long before the possibility of chartering to BP occurred, despite repeated promises, Marecsa was unable and failed to produce a contract with Pemex. At all times the Toisa Pisces was available in Mexico for chartering by Pemex and it was in fact Sealion who kept pushing Marecsa for a prompt delivery date and confirmation of a contract.
>
> "Hearsay", whether valid or invalid is irrelevant to our decision not to move forward with Marecsa. The primary reason as aforesaid being that Marecsa has failed to produce a contract with Pemex as repeatedly promised. To date Marecsa has failed to sign and return Addendum No. 1 to the Transaction Agreement which was sent to Marecsa on May 3, 2010 (replacing the null and void previous Addendum executed by Marecsa on March 23, 2010), said Addendum No. 1 outlining the terms and conditions on which Marecsa and Sealion would work on the basis of a one year direct award at a rate of at least USD69,500 per day, pro rata. The addendum was never signed to begin with and was in any event to be considered null and void if such an award from Pemex was not granted. Moreover, there are various additional outstanding issues as repeatedly acknowledged by Marecsa between Marecsa and Sealion including, but not limited to, the failure of Marecsa to agree in writing or otherwise to our email of May 17 and execute the necessary Sub-Contractor Agreement. Both agreements are obviously conditions precedent to a contract with Pemex being concluded via Marecsa. Marecsa's failure to so agree and execute the Addendum No. 1 for in excess of two months and the Sub-Contractor Agreement for almost two months, clearly indicates a lack of an agreement for Marecsa to act as our venue on this Pemex business and therefore pre-empts and renders null and void any and all agreements between Sealion and Marecsa for Marecsa to act as our venue in securing the Pemex contract for the Toisa Pisces.
>
> Notwithstanding the foregoing and without prejudice to same, Sealion offers herewith via the medium/Marecsa to deliver the Toisa Pisces to Pemex on December 31, 2010 for a period of three years at a daily rate of USD67,000 with terms as per previous contract. This offer is valid to and for reply no later than to the close of business New York this Friday, July

---

[5] Whether or not "window-dressing" is an appropriate description of this email does not seem to me to matter since, on my view of the evidence, there was no prospect of Marecsa obtaining a contract with Pemex by this time, as I explain elsewhere.

> 9, 2010 failing conclusion of this fixture with an award by Pemex as above and within the time limits set, we shall be free to pursue business with Pemex on this vessel through others excluding Marecsa, a right which we anyhow have given our foregoing comments in the preceding paragraphs, as we have no exclusive agreement with Marecsa on negotiating this vessel on Pemex business through them.

67.   Marecsa's lawyer responded on 9 July.  He first attached a letter from Pemex of, apparently, 1 July which read in translation:

> In reference to your official letter ... received on 26[th] May 2010 ... informing us about the departure of vessel "Toisa Pisces" to USA, we hereby request you to update us on the availability of such vessel, in order to continue with the internal process and to determine whether it is possible to contract it for PEP.
>
> ...

I could give no weight to that letter.  Even Mr Delgado got close, in his evidence, to admitting that it might have been procured deliberately, rather than being a spontaneous emission. Angel Ortiz, the signatory had, according to his witness statement, a title different from that over which he signed the letter, and it appeared to come from a section of Pemex which was not that intended for *Toisa Pisces*.

68.   The final nail in the coffin in this respect came when Mr Ortiz, having at the outset of cross-examination said that he had not spoken to Mr Delgado since 2012 or 2013, flatly (and twice) maintained that stance in re-examination, even though Marecsa's counsel had put to him very clearly his instructions, which were that he had spoken to Mr Delgado and his lawyer only in the previous few days.

69.   I must wholly disregard Mr Ortiz's evidence in these circumstances. It seems to me that he had been primed by Mr Delgado to give what evidence he did provide, and I have little doubt that the 1 July letter was procured from him in a similar way and cannot therefore be relied upon.

70.   Reverting to what Marecsa's lawyer wrote on 9 July, his email continued:

> It is correct that on May 3rd you provided us a draft of an addendum, nevertheless there was already an addendum agreed and signed, as well as an agreement to accept a one year direct award by Pemex.  Also, by the date received, it was clear that Sealion's intention was to sail the vessel, as you did, to attend the BP contract.  On May 4th the vessel sailed ... and although returned to Mexico on/about May 10, only to sail again to USA by the end of May, 2010; consequently, this prevented the parties from finalising the terms of your draft.
>
> Despite this, MARECSA has been pursuing and following the contract to PEMEX, this was discussed with your chairman, Gregory Callimanopoulos on May 18th through a telephone conversation, during which MARECSA advised that it would not be convenient to set a date that Sealion would not be able to meet, otherwise MARECSA/SEALION could be subject to penalties if the vessel is not delivered on the date provided for in the Pemex contract.   In view of Marecsa's advice, Mr Callimanopoulos requested Marecsa to advise PEMEX of the BP project and inform that Marecsa will keep PEMEX advised on date of return, MARECSA sent Sealion a copy of such letter on June 2nd.

71.   Although Sealion had written on 6 July with their "offer", it was only on 9 July, the date of the deadline they sought to impose, that Mr Delgado wrote to Pemex advising that the vessel would be available on 31 December.   He did not, however, seek to impose any deadline on Pemex for a response, and he did not offer a 3-year contract.

72.   In another email from Mr Dan Sullivan (see paragraph 33 above) to Mr Delgado, written on 11 July, the following appeared:

> Baldwin is obviously posturing to eliminate the legal exposure.   While everyone knew the direct award was coming, the strength of his argument is that Pemex never issued a letter confirming a direct award, subject to the contract, so he will argue that Marecsa was unable to obtain the contract.   From your side, of course, we know there was an internal decision, there was a rate and period negotiation which reached a mutual agreement, and draft contracts were exchanged. ... The only reason it did not reach conclusion was that the process was frustrated by departure of the vessel and the lack of dates from Sealion.
>
> The slow development of the direct award, and perhaps the absence of a letter from Pemex, was caused by ship sailing from Mexico without permission, and their refusal to say where it was – again, frustration of your efforts.

...

It would be helpful to know how they are approaching Pemex here, but I think that now is the time to use some of your political connections to stop their alternative discussion and essentially have Pemex advise them that if they want to charter to Pemex, they must use Marecsa.

...

73.   Again, it is entirely unclear what other exchanges had taken place between Mr Delgado and Mr Sullivan before and after this message. There were no other related messages disclosed and Mr Delgado purported to be unable to recall.  I can only assume that what Mr Sullivan wrote was based on what he had been told by Mr Delgado. Whatever that may have been, on 20 July Sealion provided a letter to Diavaz, plainly intended to be shown to Pemex, confirming that if Diavaz succeeded in obtaining a contract from Pemex they would make *Toisa Pisces* available to Diavaz subject to a mutually agreeable charterparty, and on 22 July Diavaz wrote to Pemex confirming that *Toisa Pisces* would be available to Pemex from 20 November 2010 for $69,850 per day for a minimum period of 18 months.   As already mentioned (paragraph 12), in early 2011, Pemex awarded a 22-month contract to Diavaz and Sealion.

*The parties' cases in outline*

74.   Sealion's case was, on its face, simple.   Marecsa owe them $3,807,538.55 (plus interest) and there were only 2 issues in relation to the figures, the first being as to the Disputed Amount, and the second as to the credit, if any, to be given for operating expenses.  The latter in fact forms part of Marecsa's counterclaim. On Sealion's case, the main issue for me to determine was whether they were entitled to seek a new Pemex contract without Marecsa.

75.   Marecsa's case, in opening, was that the central issue is whether Sealion are entitled to sue on the Transaction Agreement or whether the terms of either Addendum No. 1 or what I refer to as

the revised draft Addendum No. 1, or other agreements related to them, preclude such a claim.   If, they said, Addendum No. 1 remained effective, then it was common ground that it would preclude suit.

76.  Whilst Sealion maintained that Addendum No. 1 did not remain effective, because it was designed to fail if the parties did not get a 3-year contract with Pemex, Marecsa said that the requirement for such a contract was abandoned "(whether by agreement, waiver, estoppel or otherwise)" when the parties began negotiating shorter contracts, and certainly by the time that they set about obtaining a 1-year contract.   A key issue in this respect was, Marecsa said, whether the agreement that a 1-year contract would be sufficient to satisfy Addendum No. 1 needed to be in a signed written form in order to bind the parties.   However, it seems to me that the prior question is whether the parties actually agreed to that effect at all.

77.  In their written closing, Marecsa said, in outline, that they had no liability under the Transaction Agreement because Addendum No. 1 compromised/suspended any liability under that Agreement, which did not come back to life because the full effectiveness of Addendum No. 1 was conditional on the parties obtaining a 3-year contract from Pemex.   In relation to that, Sealion had prevented the parties getting any contract at all by withdrawing and refusing further participation in July 2010 (and could not rely on their own wrong in this regard), and Addendum No. 1's requirement for a 3-year contract had been replaced (by reason of variation, waiver or estoppel) by a requirement for a 1-year contract and, but for Sealion's default, the parties had, or would within a reasonable time have, obtained a 1-year award from Pemex.

78.  Marecsa said that the Transaction Agreement did not come back to life by reason of their non-compliance with Addendum No. 1.   And even if the Transaction Agreement were to be held applicable,

Marecsa would set off damages/debts payable pursuant to their counterclaim.

79. That counterclaim arose because, Marecsa said, Sealion's withdrawal in July 2010 and refusal to participate in ensuring that the proposal made in April succeeded was a breach of contract which caused Marecsa loss, because Pemex would otherwise have awarded the parties a contract.

*Addendum No. 1*

80. The background to Addendum No. 1 which seems to me to be relevant when considering its effect is that by the time it was entered into, Marecsa had admittedly and dishonestly failed to pay very substantial sums to Sealion which they had in fact received, contrary to their statements, from Pemex.  Further, they had failed to repay that amount by the instalments of $300,000 per month agreed in the Transaction Agreement, and failed to comply with their November 2009 promise to pay at least $120,000 per month. They had also failed to comply with their promise to ensure that the earnings from the *Bourbon Opale* would be assigned and paid to Sealion.  Against this background I accept that it would have been clear to Marecsa that they were, as counsel for Sealion put it, "in the last chance saloon", and that further business between the parties would depend on written contracts setting out expressly and fully what each party had to do.

81. It is also significant that, at the same time as entering into the Transaction Agreement, the parties agreed an addendum to their Subcontractor Agreement, which they had concluded at the same time as the Joint Venture Agreement in January 2003 (see paragraph 5 above).  By this addendum the parties deleted clause 9 of the Subcontractor Agreement.  Under that clause Marecsa had agreed that they would not enter into any Pemex bids for offshore

services without first offering Sealion the opportunity to participate, and Sealion had agreed that they would not enter into any Pemex bids for well-testing vessels until they had offered Marecsa the opportunity to participate.  Thus, following this addendum, there was no reason for Marecsa to think that in future Sealion was not free to seek other avenues to obtain lucrative employment for the vessel with Pemex: if anything, they should have realised that it was quite possible that Sealion would do so.  And that was put beyond doubt when, on 10 February 2010, at the final stages of negotiation of Addendum No. 1, Sealion wrote to Marecsa:

> … we must have your acceptance … by … Friday, February 12th failing which we will proceed in negotiations with Pemex via other venue.

- a point that Sealion reiterated 2 days later, referring to pursuing employment of the vessel with Pemex "through and with others".

82.   Under Addendum No. 1 to the Transaction Agreement, it was envisaged in clause 5(a) that the parties would enter into a fresh Subcontractor Agreement on or before 10 April 2010.  Sealion suggested that their participation was only required under Addendum No. 1 if such an Agreement had been executed, but I do not accept that.  The requirement for such an Agreement was not a condition precedent.  In the result, however, this is of no significance.

83.   Sealion accepted that they were required to make *Toisa Pisces* available for a potential contract with Pemex until such time as it reasonably appeared to them that Marecsa were unable or unlikely to secure such a contract.  That, said Sealion, was the limited restriction which at most could be implied into Addendum No. 1 in the light of its express terms and the circumstances in which it came to be agreed.  But it could not mean that they were not able to consider and even approach other partners meanwhile.  Those submissions seem to me to be correct.  However, they give rise to

other questions, in particular as to how I should approach the question of assessing a reasonable time.  There is, though, the prior question as to whether there had been some alteration, by way of variation, waiver or estoppel, of the Addendum's requirement for a 3-year contract.

*Did Addendum No. 1 require a 1-year contract by virtue of variation, waiver or estoppel?*

84.   In a long section of their closing submissions, counsel for Marecsa argued forcefully that the revised draft Addendum No. 1 (see paragraph 42 above) reflected an agreement that had already been reached orally, alternatively the parties' conduct after the revised draft Addendum had been sent showed that they had been acting on the basis that it formed the agreement between them, rather than the original Addendum No. 1.

85.   In the event that I was not satisfied that the parties agreed that a 1-year award would satisfy Addendum No. 1, or I concluded that formal execution of a revised Addendum was required, and in the alternative to their case on variation, Marecsa argued that Sealion waived the need for execution of a revised Addendum and/or the requirement for a 3-year award, and/or were estopped from relying on non-execution or denying that a 1-year award would have been sufficient to satisfy Addendum No. 1.

86.   After giving the matter careful consideration, I have come to the conclusion that Marecsa's arguments in these respects must be rejected.  In the first place, as a matter of fact, Mr Delgado knew from an email sent to him by Sealion on 24 February 2010, 2 days after the draft of Addendum No. 1 had been provided, that:

> [Sealion] will not grant you authority to enter into any discussions with Pemex regarding the Toisa Pisces until we have a signed agreement (Addendum No. 1 to the Transaction Agreement).
>
> ...

87.   That was hardly surprising given the history of the relationship to date, and in his evidence Mr Delgado admitted that he knew that Sealion was not prepared to agree anything until it was in writing and signed.   I cannot believe that either of these parties, in the prevailing circumstances, would have considered that they would enter into any legal relationship or change any existing legal relationship on the basis of unspoken understandings: they would have known that a jointly signed document would be required. There was also evidence internal to Sealion, which I need not recite, which confirmed that their subjective intention was that there should be no binding agreement until signature.

88.   Further, because Mr Delgado knew at all relevant times that Sealion did not intend to be bound until signature, Marecsa could not, counsel for Sealion argued, rely on the objective rule as to the creation of legal relations or as to the construction of a contract (or, indeed, upon estoppel, variation, waiver or forbearance).   In this respect, counsel referred to *Chitty* paragraph 2-164. If a party knows that the other party subjectively does not intend to be bound by an agreement or promise, that party cannot invoke the normal objective test in order to try to hold the other party to be bound.  I accept this submission.

89.   In addition, the way in which the hoped-for hire was to be divided between Marecsa and Sealion under clause 5(e) of Addendum No. 1 clearly showed an expectation of a 3-year contract at $70,000 per day.  The idea that if Pemex had agreed to, say, a 1-year contract at $90,000, the same basis should be used for splitting the hire is inconceivable.  That is because, as counsel for Sealion pointed out, the proportion of hire that Marecsa would then be receiving would be approximately 13%, i.e. almost double what they would receive with a rate of $70,000.  That would have been wholly contrary to Sealion's interests, as Marecsa would have realised.

90. It was said for Marecsa that the decision to offer the vessel to Pemex on a 1 or 2-year basis necessarily involved the parties deciding that they would work together essentially on the basis set out in Addendum No. 1 even if a 3-year contract was not obtained. I disagree: there was no such necessary implication.  Far more likely is it that the parties would have thought - at least once they reflected fully on the situation - that the relationship reflected by that Addendum would have to be revised, perhaps substantially, depending on what contract might be available.

91. Similarly, I reject the idea that when the parties submitted the proposal that was made in March 2010 they can only have done so on the basis that even if only the 1 or 2-year option was acceptable to Pemex, then Addendum No. 1 would remain "alive and well and not be defeated by failure to obtain a 3-year award".  Apart from anything else, the parties never expected and certainly did not want Pemex to agree to either of the shorter options: the point of including those was to drive them to the third.

92. When the draft revised Addendum was sent, Mr Delgado did not sign it or comment upon it.  In fact he did not react in any way even when he was chased by Mr Callimanopoulos.

93. Further evidence of the fact that the revised Addendum No. 1 was not agreed, and was not considered by the parties to reflect any agreement between them, was to be found in an email sent by Marecsa's lawyer on 9 July when he referred to the draft provided on 3 May, went on to talk about the BP contract and concluded this part of his message with the words "... consequently, this prevented the parties from finalising the terms of your draft."

94. It looks to me rather as if Sealion's eye came off the ball at this time.  Having regard to their fundamental interests, if a 1-year contract was to be concluded with Pemex, a substantially different

agreement from that contained in the Addendum (whether as revised in the draft or not) was required.  It seems to me that inadequate thought was given on Sealion's side to this.  My view in this respect is reinforced by the fact that there was something of a mild panic on 3 May to get a draft revised Addendum out to Mr Delgado, and by its inadequacy in terms of drafting (there were some gaps and date references that were inappropriate in the prevailing circumstances).

95.   However, that does not affect the fact that, viewed objectively, there was, on my findings, no agreement, assumption or representation that the parties would ultimately have been content, if a 1-year contract had been granted, with Addendum No. 1 as it stood or even as it appeared in the revised draft.  Whilst it is right to observe that the draft was sent with a request that Mr Delgado execute it, I do not think the use of that expression can be given any weight in terms of indicating that there was some prior agreement: if anything, that requirement would tend to underline the idea that there would be no agreement until signature.

96.   For all these reasons I cannot accept that there was any binding agreement between the parties to vary Addendum No. 1.

97.   As regards the case based on estoppel, waiver or forbearance, some of the considerations just mentioned in relation to variation are relevant.  Counsel for Marecsa drew my attention to a number of factors, including (i) that "Addendum No. 1 and the parties' proposals to Pemex were .. bound up with each other and part of the same package of agreements", (ii) the parties agreed in March and again in April 2010 that they would work together to pursue a 1-year contract if they could not get a longer one, and (iii) actually pursued that "in respect of which they had agreed to work together on the basis set out in Addendum No. 1" (an assertion that seemed to me to be unsupported by any evidence), (iv) Sealion's request that Mr

Delgado keep Pemex happy during the BP charter with a view to the vessel entering a 1-year charter on its return, and (v) that on 27 May Sealion wrote to Marecsa in effect relying on Addendum No. 1 in demanding that Marecsa re-commence the payments they should have been making under that agreement.

98. However, I cannot find in any of these factors, whether viewed separately or together, any representation or promise on Sealion's part, let alone one that was at all unequivocal. The same is true for the points argued in respect of a variation: there could, for example, be no certainty over the various permutations of scenarios that might arise depending on whatever contract, if any, Pemex was prepared to award. Nor could failure to insist on strict performance of the contract assist Marecsa, since that too is not unequivocal, any more than is any willingness to renegotiate some kind of compromise.

99. As for any reliance by Marecsa upon any alleged representation etc., it was said for them that this was shown by (i) the fact that they engaged in pursuit of a contract for less than 3 years, (ii) liaised with Pemex to keep a 1-year option open during the BP charter, (iii) retained employees on the vessel in anticipation of a new contract, (iv) did not employ resources elsewhere in marketing their services to others, and (v) proceeded generally on the basis that the payment structure continued to govern the parties' relationship even if only a 1-year contract could be obtained, all without the revised draft Addendum No. 1 being executed.

100. I do not find that these factors support a case of reliance, let alone any reliance to Marecsa's detriment. Apart from the fact that the evidence did not seem to me to support at least points (iii)-(v), I cannot see what Marecsa would or even might have done differently even if some relevant representation could have been shown - particularly bearing in mind that I am satisfied that they did not

wish to get and would never, within any relevant timescale, have got Pemex's agreement to a 1-year, or indeed any, contract

101.  As to the possibility of estoppel by convention, there was nothing here to suggest that there was an assumption that the parties shared, let alone one that was unequivocal and unambiguous.

*The relevance of any alteration to Addendum No. 1*

102.  Whilst this is a matter that, on my conclusions, is not significant, I think it appropriate to mention that I agree with Sealion that in any event the question whether Addendum No. 1 was varied in any way is irrelevant.  This is, in particular, because firstly there never was and never would have been any award of a contract by Pemex within a reasonable time (as to which see below); secondly I consider that Marecsa were in breach of the Addendum (whether altered or not) which extinguished any further obligations on Sealion; and thirdly because as a result of Marecsa's breaches (by failing to pay what was due) Sealion was expressly entitled after May 2010 to exercise any rights it had under the Transaction AgreementS.

*Did the BP contract, or Sealion's actions, prevent a further Pemex contract being concluded?*

103.  In the light of all my findings above, the answers to these questions must be in the negative.  It is clear that Pemex were perfectly happy with the fact that the BP charter was entered into and did not stop their own internal processes for the preparation of a contract. On the other hand it appears that Marecsa stood no material chance of obtaining a further contract with Pemex, given their standing with that organisation at the time.  Further there is every indication that they had another iron in the fire and that it suited them not to

pursue negotiations, at least once the vessel had left to serve the BP charter and quite possibly from considerably earlier[6].

*Would the parties have obtained a 1-year contract within a reasonable time?*

104.   It does not seem to me that Marecsa's argument that, but for what they said was Sealion's breach, they and Sealion would have obtained a contract with Pemex within a reasonable time, is well-founded.   The suggestion advanced on Marecsa's behalf that a reasonable time lasted at least until in fact Sealion were able to procure a contract with Diavaz, i.e. early 2011, is wholly uncommercial and unrealistic since it would have involved Sealion having to hold the vessel free for many months, losing millions of dollars, in the hope that a contract would materialise.

105.   What was a reasonable time must be assessed by reference to when it reasonably appeared to a reasonable party in the position of Sealion that Marecsa were not going to be able to procure an award of a contract with Pemex.  Given the series of unfulfilled indications from Marecsa as to when a contract was likely to be awarded, what Sealion's Mexican lawyer had been told by Pemex about Marecsa and what Mr Avila said to Mr Peri Callimanopoulos in May 2010, by the end of June 2010 Sealion were plainly reasonable in concluding that there was no realistic prospect of them getting a Pemex contract with Marecsa.

106.   There was a faint suggestion that even if I were to come to the view just expressed, Sealion could not rely on any reasonable time having expired, because of waiver or estoppel.  But this case was not developed in any detail, and I can find no unequivocal representation or promise, and in any event no reliance.

---

[6] A helpful schedule handed in by Sealion's counsel in closing showed how, in a large number of communications between March and early June 2010 Sealion had pressed Marecsa for progress and Marecsa had fobbed them off with various indications, none of which materialised or apparently stood any chance of becoming reality.

*Did the Transaction Agreement come back to life?*

107.  In truth, of course, the Transaction Agreement always was alive, although it had been amended by Addendum No. 1 (and, on Marecsa's case, which I have rejected, further by variation, waiver or estoppel).   In view of my findings, Addendum No. 1 failed because it was intended by virtue of clause 9 only to apply if a 3-year contract was obtained.   Otherwise it was not to be valid, effective or of force.   And by its clause 11 all other terms, etc. of the Transaction Agreement remained unaltered and in full force and effect.   Thus the Transaction Agreement governed the parties' relations, on my view of the matter, and it must follow that Sealion's principal claim (subject to the Disputed Amount) must succeed.

108.  There was also a debate as to whether Marecsa were in repudiatory breach of Addendum No. 1 because of their failures to pay in accordance with it.   This question does not, in the event, arise; but my view (for what it is worth) is that had it been relevant, Sealion would have had the better of the argument.

*The Disputed Amount*

109.  Whilst negotiating the content of Addendum No. 1, on 18 January 2010 Mr Delgado wrote, at the end of an email dealing with various points on the draft Addendum:

> Last, we would like to state that at this time we need to place an end to the interminable audit issue, and the agreement should also include a mutual release and waiver relating to claims and/or counterclaims relating to the audit issues … MARECSA is prepared to make a concession of 25% of the audit claim …

110.  On 19 January Mr Callimanopoulos replied, again after dealing with the Addendum:

> Assuming we reach agreement herein we are willing to settle the audit at the amount of USD 440,000 which was the amount agreed as due/not disputed during the last meeting.

111. In subsequent communications Mr Delgado asked that the "audit issues be dropped completely" but Mr Callimanopoulos insisted on his email of 19 January "which addresses settlement of the audit for confirmation by return".   Marecsa ultimately accepted Sealion's terms.

112. On balance, I accept Marecsa's argument that the agreement on the figure for the Disputed Sum was conditional on the parties agreeing the Addendum, as they did, rather than on the success of the proposal to Pemex which the Addendum envisaged.   I therefore conclude that the agreement to $440,000 does not fail with Addendum No. 1 but remains binding, and this is therefore the only amount to which Sealion are entitled in respect of the Disputed Sum.

*Marecsa's counterclaim*

113. I can deal with this very shortly.  Marecsa claimed $320,197.51 in respect of disbursements.  Sealion originally said the amount due was only $189,338.13  but latterly put that at $96,142.68 without, Marecsa said, explanation.  This latter sum was credited by Sealion in calculating their claim (see paragraph 14 above).   The only evidence in support of the difference between the two was Mr Delgado's assertion that a schedule upon which Marecsa relied in advancing their figure reflected the facts.   In the absence of any other documentary evidence, and given that I feel unable to rely on Mr Delgado's evidence save as earlier expressed, I can only accept Sealion's figures.

114. In the result, Sealion are entitled to an award for the total of their claim, $3,807,538.55, less the difference between the $440,000 which I find to have been agreed in respect of the Disputed Amount and the figure of $831,309.34, i.e. less $391,309.34, giving them a final entitlement of $3,416,229.21, plus interest as set out in my award.  They are also entitled to their costs.

115. I am very grateful to the parties' advisers and in particular to counsel who, on each side, presented their respective cases with great thoroughness and energy.  I am only sorry, and apologise for the fact that it has taken me so long to produce this award.  To some considerable extent that is a reflection of the skill with which the respective cases were put, which left me unusually open-minded at the end of the hearing, thus necessitating a considerable level of re-reading and thought.  Added to that was a period of unexpected but unavoidable and heavy commitment to other matters which meant that the time required to do what I needed on this case was simply not available until now.  I am grateful for the parties' patience.